# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 20-0051V
UNPUBLISHED

| | |
|---|---|
| JANET JACKSON,<br><br>    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: June 2, 2023<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza Vaccine; Shoulder Injury Related to Vaccine Injury (SIRVA) |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.

*Nancy Tinch*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On January 15, 2020, Janet Jackson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered from a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on February 6, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Although Ms. Jackson has been found entitled to compensation, the parties were unable to agree to damages.

For the reasons discussed below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of **$125,548.50**, representing

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

$125,000.00 for actual pain and suffering, plus $548.50 in unreimbursable out-of-pocket expenses.

## I.     Relevant Procedural History

Approximately 20 months after this case was initiated, Respondent filed his Rule 4(c) Report on September 30, 2021, conceding that Petitioner was entitled to compensation. ECF No. 31. A ruling on entitlement was subsequently issued on October 4, 2021. ECF No. 32. On March 17, 2022, Petitioner filed a status report indicating that the parties had reached an impasse in their discussions regarding damages. ECF No. 39. The parties then filed memoranda setting forth their respective positions on pain and suffering - the only disputed damages element. ECF Nos. 40 ("Br."), 43 ("Opp."), 44 ("Repl."). I proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed issues. ECF. No. 45. That hearing was held on May 26, 2023,[3] and the case is now ripe for decision.

## II.    Relevant Medical History

A complete recitation of the facts can be found in the Petition, the parties' respective pre-hearing briefs, and in Respondent's Rule 4(c) Report. In summary, Petitioner's medical history includes basal cell carcinoma, hypertension, hypothyroidism, high cholesterol, left plantar fasciitis, and left hip bursitis, but no history of right-shoulder problems. See Ex. 4-5. Petitioner received a flu vaccine in her right deltoid on February 6, 2018, which she described as "very painful." Ex. 1 at 2; Ex. 11 at ¶4.

Within several hours, her shoulder pain was severe, and later that same day she had difficulty laying down, reaching outward, and sleeping. Ex 11 at ¶4. Petitioner stated that her pain continued for weeks and that she used OTC medications but they did not help. *Id*. at ¶5. She contemplated seeking medical care in Florida (where she and her husband spent the winters) but did not think she would receive good care from a doctor she hadn't met before. *Id*. She decided to wait to see a doctor until they returned to IL. *Id*.

On March 19, 2018 (41 days post-vaccination), Petitioner presented to an orthopedist complaining of "severe" right shoulder pain that began within hours of her flu vaccination. Ex. 2 at 16. Petitioner reported "significant night pain" and her range of motion was limited by pain. *Id*. She had positive impingement signs and was tender to palpation. *Id*. An x-ray showed degenerative changes of the glenohumeral and

---

[3] At the end of the hearing held on May 26, 2023, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

acromioclavicular joints. *Id*. Petitioner was diagnosed with internal impingement of the right shoulder and given a cortisone injection, which gave her immediate relief. *Id*. at 17. She was also prescribed Mobic and referred to physical therapy. *Id*.

Petitioner presented to physical therapy on March 22, 2018, but declined treatment when she learned that she had a $500 deductible. Ex. 6 at 74. She returned on March 28, 2018 (6 days later) for an initial evaluation. *Id*. at 71. She presented with right shoulder pain, along with deficits in range of motion and strength, although she reported that she could sleep and do most motions and activities. *Id*. Petitioner reported 75% improvement since her cortisone injection and with the Mobic, and pain of 0/10 that day. *Id*. Petitioner attended five physical therapy appointments through April 10, 2018. *Id*. at 59-72. Petitioner stated that she stopped PT due to cost. Ex. 11 at ¶7,

On April 16, 2018, Petitioner returned to her orthopedist reporting significantly diminished pain and significantly improved strength and range of motion. Ex. 2 at 14. The treater recommended continuing Mobic and Petitioner's home exercises. *Id*. Petitioner returned to her orthopedist less than a month later, on May 7, 2018, reporting a recurrence of symptoms. Ex. 2 at 12. He administered a second cortisone injection, again providing Petitioner immediate relief. *Id*. at 13. Petitioner reported that she performed her home exercise program from physical therapy after the second injection, with the goal of avoiding surgery. Ex. 11 at ¶10. Her efforts did not work, but she "waited as long as she could" before returning to her orthopedist, who she knew from previous discussions was likely to recommend surgery. *Id*.

On May 15, 2018, Petitioner presented to her PCP for management of her chronic conditions. Ex. 5 at 17-22. She was prescribed Meloxicam and Voltaren gel for her right shoulder pain. *Id*. at 22. Petitioner had an MRI on July 24, 2018 which revealed a full-thickness tear of the supraspinatus, a small labral tear, subacromial spurring and narrowing (concerning for impingement), AC osteoarthritis, and mild atrophy. Ex. 2 at 47-48. She returned to her orthopedist on July 30, 2018 to review the MRI results. *Id*. at 8. He noted that Petitioner's pain was "severe" and that she had failed conservative measures. *Id*. at 9. He did not recommend further non-surgical treatment and offered surgery. *Id*.

On August 13, 2018, Petitioner presented to her PCP for a pre-surgery appointment. Ex. 5 at 23. She reported shoulder pain "about 50% of the time" and rated her pain at 8-10/10 when laying down or with movement. *Id*. at 23-23. She stated that her shoulder pain disturbed her sleep and that she was not able to lift her arm laterally at all. *Id*. at 22.

On August 21, 2018, Petitioner underwent right shoulder arthroscopic subacromial decompression and distal clavicle excision with mini open rotator cuff repair. Ex. 3 at 5-6. She experienced some respiratory complications from anesthesia and remained in the hospital overnight. *Id*. at 7. Petitioner reported the decreased respiration she experienced "caused her considerable anxiety." Ex. 11 at ¶12.

On September 5, 2018, Petitioner presented for a two-week follow up with her orthopedist. Ex. 2 at 6. She reported minimal pain and was no longer in a sling. *Id*. Petitioner reported continued sleep disturbance from the immobilizer she was instructed to wear. Ex. 11 at ¶13. She was unable to drive and required assistance with bathing. *Id*.

Petitioner returned to her orthopedist on October 3, 2018, for a 6-week post-surgery follow-up. Ex. 2 at 4. She reported continued pain, with some stiffness and weakness. *Id*. The orthopedist noted that Petitioner had been non-compliant with her use of the immobilizer, and as a result he could not tell if she had normal post-operative weakness or if the surgery was a failure. *Id*. at 5. He recommended physical therapy – with the expectation that pain would decrease and that strength and range of motion would improve if the surgery was successful. *Id*.

On October 5, 2018, Petitioner presented for a post-surgery physical therapy evaluation. Ex. 6 at 54. She reported dull pain and some numbness in her thumb. *Id*. She attended 23 physical therapy sessions through December 31, 2018. *Id*. at 2.

On November 14, 2018, Petitioner went to her orthopedist for a follow-up. Ex. 8 at 6. She reported minimal pain and excellent strength and range of motion. *Id*. The orthopedist noted that Petitioner had significantly improved symptoms, but could continue to improve with additional physical therapy. *Id*. at 7.

On November 27, 2018, Petitioner saw a chiropractor for treatment of lower back pain she attributed to her shoulder physical therapy. Ex. 10 at 5. Petitioner rated her back pain as 9/10, but stated she was able to perform her work duties and had not missed any time at work. *Id*. Petitioner received 3 chiropractic treatments. *Id*. at 4-9.

On February 13, 2019 (one-year post-vaccination), Petitioner returned to her orthopedist for a final follow-up visit. Ex. 8 at 4. She reported minimal pain and excellent strength and ROM. *Id*. No further treatment was recommended. *Id*. at 5.

Petitioner did not seek further treatment for her right shoulder pain. As of January 6, 2020, Petitioner stated that she continued to struggle with certain movements, such as

clasping a bra, but noted that she is "very happy with the progress her right shoulder has made." Ex. 11 at ¶15.

### III. The Parties' Arguments

#### A. Petitioner

Ms. Jackson seeks $140,548.50, consisting of $140,000.00 as compensation for her pain and suffering, plus $548.50 for past unreimbursable expenses. Br. at 24. The parties agree on the amount requested for out-of-pocket expenses. Br. at 16; Opp. at 17-18.

Petitioner argues that her SIRVA injury caused her severe pain, required significant treatment, including surgery, over 12 months, and impacted her mental health. Br. at 18-20. Petitioner reported severe levels of pain during her pre-surgery treatment, which included two cortisone injections and physical therapy. *Id*.; Repl. at 5-6.

During the hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants, arguing that an award of $140,000.00 in pain and suffering was reasonable and appropriate given that her circumstances were comparable. Br. at 21-23.

#### B. Respondent

Respondent suggests that a lesser award of $87,500.00 is appropriate. Opp. at 17. Respondent argues that Petitioner's SIRVA injury was "limited and mild" because Petitioner waited 41 days to seek treatment, received "immediate relief" from two cortisone injections, and reported 75% improvement after her first pre-surgery physical therapy appointment. *Id.* at 8-9. Respondent also suggests that Petitioner's non-compliance with treatment contributed to her pain, and thus justifies a lower pain and suffering award. *Id*. at 9-10. Finally, Respondent highlights the fact that Petitioner had a good recovery after treatment. *Id*. at 11-12.

Although Respondent did not specifically distinguish all of the cases cited by Petitioner, he generally argued that Petitioner's comparable decisions involved petitioners who consistently had more severe pain and required more aggressive treatment. Opp. at 12-15. During the hearing and in his brief, Respondent also presented prior SIRVA cases as the basis for his proposed pain and suffering award. Opp. At 15-17.

### IV.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves,* 109 Fed. Cl. at 589-90. Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. While *Graves* is not controlling of the outcome in this case, and its reasoning to some extent misapprehends the reasonable efforts of special masters to place comparable damages decisions in context of similar injuries, its emphasis on the petitioner's own showing/entitlement to a specific award has great merit.

## V.    Prior SIRVA Compensation Within SPU[5]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|              | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[7] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 88 | 1,223 | 28 | 967 |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

---

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

### B.     Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, the actual or past pain and suffering award varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion, and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy. None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

---

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs*., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

## VI. Appropriate Compensation in this SIRVA Case

### A. Awareness of Suffering

Awareness of suffering is not typically a disputed issue in cases involving SIRVA – and it does not appear to be herein. Neither party has argued that Ms. Jackson lacked awareness of her injury, thus, I find that Petitioner had full awareness of her suffering.

### B. Severity and Duration of Pain and Suffering

Petitioner's medical records and affidavit describe an overall moderate SIRVA injury that required surgery to treat. Although Petitioner delayed treatment some in the beginning, her delay of 41 days (just shy of six weeks) was not extensive, and was reasonable considering her travel away from home at the time. Petitioner consistently (other than shortly after her cortisone injections) reported high pain levels prior to her surgery. Ex. 2 at 8, 16; Ex. 5 at 22-23; Ex. 11 at ¶4. She was prescribed one medication, had five physical therapy treatments, and two cortisone injections prior to her surgery.

Petitioner underwent a successful surgery, including both arthroscopic and open procedures, about six months after her vaccination. Ex. 3 at 5-6. After her surgery, Petitioner remained in the hospital overnight due to a minor complication from the anesthesia. *Id*. at 7. Other than her overnight stay, Petitioner's recovery after surgery was excellent. She had four follow-up appointments with her orthopedist, 23 physical therapy treatments, and three chiropractic treatments. At her six-week post-surgical appointment, Petitioner's orthopedist noted that she had not been using the immobilizer that he had prescribed, which put her at risk for a failed surgery. Ex. 2 at 5. Although Petitioner ultimately enjoyed a good recovery, her non-compliance with her post-surgical instructions did complicate her treatment to a degree. At her final appointment, approximately one year after her vaccination, Petitioner reported minimal pain and had regained excellent strength and range of motion. Ex. 8 at 4-5.

Both parties provided reasonable comparable prior SIRVA cases to support their proposed award. In her brief, Petitioner cited 14 cases in which claimants were awarded between $120,000 and $135,000 in pain and suffering, arguing that although Ms. Jackson's treatment course was comparable, her surgical complications justify a higher award. Br. at 23-24. At the hearing, Petitioner cited three additional, and more recent, cases featuring pain and suffering awards between $108,000 and $115,000. *See Knasel v. Sec'y of Health & Human Servs.*, No.20-1366V, 2023 WL 2547961 (Fed. Cl. Spec. Mstr. Feb. 14, 2023); *Kestner v. Sec'y of Health & Human Servs.,* No. 20-0025, 2023 WL 2447499 (Fed. Cl. Spec. Mstr. Feb. 3, 2023); *Wylie v. Sec'y of Health & Human Servs.*,

No. 20-1314V, 2022 WL 17968929 (Fed. Cl. Spec. Mstr. Dec. 7, 2022). Petitioner argued that Ms. Jackson should receive a higher pain and suffering award than in those three cases because her treatment course was longer and because of her post-surgery complications.

Respondent also cited two cases in his brief and an additional two cases in his oral argument.[9] The first case, *Shelton v. Sec'y of Health & Human Servs.*, No. 19-0279V, 2021 WL 250093, (Fed. Cl. Spec. Mstr. May 21, 2021), involved a petitioner whose SIRVA injury required surgery, but was awarded $97,500 in pain and suffering. The *Shelton* petitioner also had three cortisone injections and 26 physical therapy treatments over a two-year period. *Id.* However, the *Shelton* petitioner had a notably significant delay in starting treatment (approximately five months) and another gap in treatment of approximately three months, suggesting that she was able to tolerate her pain for a significant period of time without treatment. *Id.* at *7. Because of that fact, the pain and suffering award in *Shelton* was lower than it would have been absent the delay. Although Ms. Jackson waited a few weeks to seek treatment once she returned to her home state, the delay herein is not comparable to *Shelton*.

Respondent also cited *Hunt v. Secretary of Health & Human Services*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022), in which the petitioner was awarded $95,000.00 in pain and suffering after a SIRVA injury treated with three cortisone injections, 19 sessions of physical therapy, and surgery over a 15-month period. Like *Shelton,* however, *Hunt* involved special circumstances – that petitioner enjoyed various periods of little-to-no pain and gaps during treatment, justifying a lower pain and suffering award. *Id*. at 8-9. In this case, although Ms. Jackson reported "immediate relief" after each cortisone injection, her relief was short-lived and she continued to treat her injury consistently through her year-long treatment. The only gap in treatment longer than one month prior to her surgery was between May 15, 2018 and July 24, 2018 while Petitioner attempted her home exercises to avoid surgery. *See* Ex. 2 at 47-48; Ex. 5 at 22; Ex. 11 at ¶10. Respondent has not provided evidence of the type of unique circumstances that would support a reduction in Petitioner's pain and suffering comparable to *Shelton* or *Hunt*.

In addition to the parties' proposed comparable cases, I deem the present action to be factually similar to another recent case: *Roberson v. Sec'y of Health & Human*

---

[9] Respondent cited *George v. Secretary of Health & Human Services*, No. 18-0426, 2020 WL 4692451 (Fed. Cl. Spec. Mstr. July 13, 2020) and *Langdon v. Secretary of Health & Human Services,* No. 20-1311, 2023 WL 3411103 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) in his oral argument. The *George* petitioner did not require surgery to treat her SIRVA injury, which is less helpful when compared to Ms. Jackson's treatment. The *Langdon* petitioner required surgery, but treated his injury for nine months and then had a two year gap in treatment, which is clearly distinguishable from Ms. Jackson's experience. *Langdon*, 2023 WL 3411103, at *3-4.

*Servs.*, No. 19-0091V, 2020 WL 5512542 (Fed. Cl. Spec. Mstr. Aug. 7, 2020). In *Roberson*, the petitioner sought treatment for his SIRVA only seven days after his vaccination, received two cortisone injections, and had 34 sessions of physical therapy (13 before and 21 after surgery). *Id.* at *3. Like Ms. Jackson, his MRI revealed a full-thickness tear, necessitating a significant arthroscopic surgery, which was successful. *Id*. The *Roberson* petitioner treated his SIRVA for approximately 11 months and was awarded $125,000 in pain and suffering. *Id*. The degree of factual similarity between the treatment course of the *Roberson* petitioner and Ms. Jackson's experience suggests an award of pain and suffering in the same range. Although Ms. Jackson waited longer to seek treatment initially and had fewer physical therapy treatments, her injury required a more significant surgical procedure, including a partially open repair, and she experienced minor surgical complications that caused her increased anxiety. *See* Ex. 3 at 5-6; Ex. 11 at ¶12.

Under such circumstances, and considering the arguments presented by both parties at the hearing, a review of the cited cases, I find that **$125,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

### C.  Award for Past Unreimbursed Expenses

Petitioner requests $548.50 in past unreimbursable expenses, which is agreed-upon by Respondent. Br. at 16; Opp. at 17-18. Therefore, Petitioner is awarded this sum without adjustment.

## CONCLUSION

In light of all of the above, the I award **Petitioner a lump sum payment of $125,548.50,** (representing $125,000.00 for Petitioner's actual pain and suffering and $548.50 for unreimbursable medical expenses) **in the form of a check payable to Petitioner, Janet Jackson**. This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.